**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Pierre Investments, Inc.** | : | |
| **2050 N. Stemmons Frwy Suite 7250** | : | **CASE NO:  2:21-cv-5312** |
| **Dallas, Texas 75207** | : | |
| | : | |
| **Pierre Investments, Inc.** | : | **JUDGE Edmund A. Sargus, Jr.** |
| **d/b/a Gehard Luxury Homes** | : | |
| **2010 Scarlet Oak Drive** | : | **Magistrate Chelsey M. Vascura** |
| **Richardson, Texas 75081** | : | |
| | : | |
| **Ken Gazian** | : | <u>**FIRST AMENDED COMPLAINT**</u> |
| **2010 Scarlet Oak Drive** | : | |
| **Richardson, Texas 75081** | : | **(Jury Demand Endorsed Hereon)** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **FRANK LAROSE, in his official capacity as Ohio** | : | |
| **Secretary of State** | : | |
| **22 North Fourth Street, 16th Floor** | : | |
| **Columbus, Ohio 43215** | : | |

1

**JEFFREY BULLOCK, in his official capacity**          :

**as Delaware Secretary of State**          :

**P.O. Box 898**          :

**Dover, DE 19903**          :

   **and**          :

**Fifth Third Bank, an Ohio banking corporation**          :

**c/o Corporation Service Company**          :

**50 West Broad Street**          :

**Suite 1330**          :

**Columbus, Ohio 43215**          :

     **and**          :

**Fifth Third Bank, Northwestern Ohio, NA Toledo**          :

**c/o Corporation Service Company**          :

**50 West Broad Street**          :

**Suite 1330**          :

**Columbus, Ohio 43215**          :

     **and**          :

**Fifth Third Bank, National Association**          :

**(a Foreign For-Profit Corporation)**          :

**c/o Corporate Service Company**          :

**50 West Broad Street**          :

**Suite 1330**          :

 **Columbus, Ohio 43215**          :

2

    and    :

**Fifth Third Bancorp**    :

**c/o Corporation Service Company**    :

**50 West Broad Street**    :

**Suite 1330**    :

 **Columbus, Ohio 43215**    :

    and    :

**Brian C. Reid**    :

**733 River Glen Road**    :

**Maumee, Ohio 43537**    :

    and    :

**Julie A. Kristenak**    :

**Fifth Third Bank**    :

**3053 Monroe Street**    :

**Toledo, Ohio 43606**    :

    and    :

**Employee # 957851**    :

**Fifth Third Bank**    :

**3053 Monroe Street**    :

**Toledo, Ohio 43606**    :

    **Defendants.**    :

Plaintiff Pierre Investments, Inc. ("Pierre") and Gehard Luxury Homes ("Gehard") file its First Amended Complaint against Fifth Third Bank, an Ohio Banking Corporation ("Fifth Third Ohio") and hereby add defendants Fifth Third Bank, Northwestern Ohio, NA Toledo ("Fifth Third, NA Toledo"), Fifth Third Bancorp ("Bancorp"), Fifth Third Bank, National Association, ("5/3, NA") and  Brian C. Reid ("Reid") and Employee #957851. This First Amended Complaint supersedes Plaintiff's Complaint filed in this Court on 11/13/2021.

## JURISDICTION AND VENUE

1. Defendant LaRose, as the Ohio Secretary of State, has his principal place of business in Franklin County, Ohio.

2. Jurisdiction and venue are proper in this Court because the records of the Ohio Secretary of State are kept in Columbus, Ohio.

3. This court has jurisdiction to issue declaratory judgment.

4. Plaintiffs seek an award of reasonable attorneys' fees and costs pursuant to RC 2335.39.

5. This Court has subject matter jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C.A. § 1332 because this case involves a dispute between citizens of different states and the amount in controversy exceeds $75,000. Venue is proper pursuant to 28 U.S.C.A. § 1391 (a) and (c).

6. This case was filed in U.S. District Court for the Southern District of Ohio against Fifth Third Ohio. Fifth Third Ohio has not answered the complaint and has not filed any motions.

## PARTIES

7. Pierre Investments, Inc is a Texas corporation located in the state of Texas. During all relevant times for this litigation Pierre's principal business address was 2050 N.

Stemmons Frwy Suite 7250, Dallas, Texas 75207. Pierre is in good standing with the Texas Secretary of State.

8. Pierre Investments, Inc also doing business as Gehard Luxury Homes ("Gehard"). During all relevant times for this litigation Gehard's principal business address was 2010 Scarlet Oak Drive, Richardson, Texas 75081.

9. Ken Gazian, is an individual residing at 2010 Scarlet Oak Drive, Richardson, Texas 75081.

10. Defendant Frank LaRose ("Defendant LaRose") is the Secretary of State for the State of Ohio, the State's chief business entity officer, and is named in his official capacity only. The Ohio Secretary of State is charged with supervision the administration of the business entities that are formed in Ohio and keeping track of active foreign businesses doing business in Ohio and preparing rules and instructions for the charter of businesses and notifying the public when a business is not in good standing.

11. Defendant Jeffrey Bullock ("Defendant Bullock") is the Secretary of State for the State of Delaware, the State's chief business entity officer, and is named in his official capacity only. The Delaware Secretary of State is charged with supervision the administration of the business entities that are formed in Delaware and keeping track of active foreign businesses doing business in Delaware and preparing rules and instructions for the charter of businesses and notifying the public when a business is not in good standing.

12. Fifth Third Bank, an Ohio Corporation ("Fifth Third Ohio") is a former Ohio banking corporation with offices throughout Ohio, that had its principal place of business in Cincinnati, Ohio.

13. Fifth Third Bank (Northwestern Ohio), NA Toledo ("Fifth Third, NA Toledo") was the registered trade name of the bank at 3053 Monroe Street, Toledo, Ohio 43606 under registration number 1481492. The registration was renewed by Fifth Third Bank, an Ohio Corporation, Charter Number 877750. The registration was cancelled August 6, 2014 under operation of law, but the trade name was still used for the Fifth Third Bank "Account Analysis Invoices" issued by from Fifth Third Bank using a Cincinnati Post office Box in December 2016.

14. Fifth Third Bank, National Association ("Fifth Third, NA") is a foreign corporation charted in 1994 in the District of Columbia.

15. Fifth Third Bancorp ("Bancorp") is a national bank with offices throughout the nation, with its principal place of business in Cincinnati, Ohio.

16. The various banks are hereafter referred to collectively as "Fifth Third".

17. Brian C. Reid was "Vice President/Commercial Middle Market Relationship Manager" at the Toledo bank in 2016 and left the bank in March 2018.

18. Julie A. Kristenak was a "Client Advisor Supervisor" or Assistant Vice President at the Toledo bank in 2016, but sometimes signed for the Second Bank Officer as Assistant Vice President. She was promoted in 2009 to Assistant Vice President.

19. Defendant Employee # 957851 is the bank employee at Fifth Third located at 3053 Monroe Street, Toledo, Ohio 43606 that is believed to have worked with account holder of account number xx8843 and failed to ever check the Delaware Secretary of State website to determine if CLS Capital Group Inc was still in business.

20. This court has jurisdiction over Fifth Third because; (1) Fifth Third transacted business in the State of Ohio by operating banks in Ohio; and (2) by incorporating in Ohio; and (3)

an employee in Columbus Ohio explained that Fifth Third has problems with opening

fake business accounts and that the account ending with xx8843 was opened in 2016.

Whenever a business is out of business, proper service on that business is through the

Ohio Secretary of State in Columbus, Ohio, therefore, jurisdiction is proper as this

lawsuit has to do with an "out of business" business continuing to do business. Here, the

employee and or AVP or VP of the Toledo bank that signed as first and second officer as

required by resolution when he or she or the officer opened bank account number xx8843

in 2016 in Ohio looked only to the Ohio Secretary of State Records in Columbus, Ohio in

trying to determine if CLS Capital Group Inc was in good standing and failed to check

Delaware Secretary of State.

### **FACTUAL ALLEGATIONS**

21. Despite a statutory obligation to keep the Ohio Secretary of State records updated to

    show which foreign corporations are no longer active, the Ohio Secretary of State has

    failed to check with Delaware Secretary of State and other secretary of states to verify

    that the records kept by Ohio Secretary of State are correct in regards to foreign

    corporations.

22. Despite a statutory obligation to keep the Delaware Secretary of State records updated to

    show which foreign corporations are no longer active, the Delaware Secretary of State

    has failed to make this information available online to the public and to the Ohio

    secretary of State at a reasonable charge and has failed to make it easy for the Ohio

    secretary of states to verify that the records kept by Ohio Secretary of State are correct in

    regards to foreign corporations based out of Delaware.

23. The processing time for Delaware Secretary of State records is 4-6 weeks.

24. The fee to obtain a certificate of Goods Standing from Delaware Secretary of State is approximately $90. Under of the US Constitution, Article I, Section 8, Clause 3, known as the Commerce Clause, this certificate fee should be waived for Ohio and all citizens. Ohio needs the information on file in the State of Delaware, to be on even standing with the state of Delaware and in order to know which of the Delaware corporations are in good standing without a 4-week delay in receiving the information from Delaware. In addition, Ohio should be provided with the information without the need to pay expedited fees to FedEx or UPS to get the information in two days when it should be immediately available to anyone who wants to know. This information should be available online without these prohibitive fees and the unnecessary delay in transmitting information to Ohio since it is needed in order to make decisions about interstate commerce and whether to do business with a person or corporation outside of the state.

25. Ohio has not been verifying if Delaware corporations are in good standing and mislead the public by indicating on the Ohio Secretary of State website that these foreign corporations are in good standing when they are non-existent and in some cases out of business for up to 10 years. An example of this is CLS Capital Group Inc.

26. Plaintiffs seek a judgment that Ohio must remove all records of defunct corporations within 3 days of being notified by Delaware Secretary of State and that Delaware Secretary of State will provide this information at no cost to Ohio.

27. If the records of CLS Capital Group Inc were accurate in Ohio, years of litigation would have been prevented as Plaintiffs would not have entered into any agreement with a corporation that had been out of business since 3-1-2012.

28. If the records of CLS Capital Group Inc were more easily accessible in Delaware, years of litigation would have been prevented as Plaintiffs would not have entered into any agreement with a corporation that had been out of business since 3-1-2012.

29. Plaintiffs were the victims of a fraudulent scheme orchestrated by Reynaldo Uballe, Jr ("Uballe") and CLS Capital Group Inc that occurred around October of 2018 and continued through September of 2021, This fraudulent scheme was facilitated by Defendant(s) by their failure to conduct proper due diligence on a foreign corporation doing business in Ohio prior to permitting them to open a business account(s), and through misrepresentations of their customer(s) as being verified and legitimate businesses.

30. The scheme involved the preparation and presentment of a fake loan commitment agreement by a Fifth Third Bank account holder who pretended to be a "lender". The commitment agreement was signed by a customer who did not have authority to act on behalf of CLS Capital Group Inc and did not have $10 million dollars to fund the commitment. The intent was to scam Pierre out of $75,000, as a condition to provide an approved and guaranteed $10 million dollar loan for development and construction of residential homes in Texas which was the construction site placed under contract with a $10,000 earnest money deposit.

31. As a result of the ability of a fake company, CLS Capital Group Inc to open up bank account(s) and to be perceived as being a legitimate, valid and verified lender, Pierre was scammed when it paid $75,000 via a cashier's check from Plaintiff's Capital One Bank branch in Texas to an account located at Fifth Third. Since Plaintiffs had been scammed before, it south assurance from CLS Capital Group Inc attorneys in Ohio, who assured

Pierre that they had done business with CLS Capital Group Inc in the past and had closed on many loans with Uballe in the past and that Reynaldo Uballe, Jr was a legitimate businessman. After review of the $10 million dollar ($10,000,000) contract, attorneys for CLS Capital Group Inc had represented that CLS Capital Group Inc as a "lender" had the ability to make the ten million dollar ($10,000,000) loan commitment.

32. Fifth Third, through employee # 957851 and vice president Reid and assistant vice president Kristenak at the bank branch in Toledo, treated Uballe as if he was a businessman and treated CLS Capital Group Inc as a legitimate entity when it opened a fake business account which permitted deposits and withdrawals of large sums that had been obtained from victims in the fake business.

33.  Pierre entered into a Loan Commitment Agreement provided by and executed with CLS Capital Group Inc through email/telecommunications.  Pursuant to the terms of this Agreement, Plaintiff was required to wire-transfer $75,000 to CLS Capital Group Inc bank account at Fifth Third in order to receive its approved and guaranteed $10 million dollar loan which was guaranteed by CLS Capital Group Inc, for the development and construction of residential homes on real estate in Texas that Plaintiff had put under purchase contract by payment of $10,000 earnest money deposit.

34. To prevent and avoid fraud, Plaintiff asked Capital One Bank for advice on how to send the $75,000 commitment fee to Ohio and it recommended purchasing and sending two cashiers checks totaling $75,000 instead of a wire-transfer.

35. CLS Capital Group Inc attorneys agreed to hold the $75,000 in an escrow account.

36. Upon reliance on this statement, and upon assurance that entities are verified by banks prior to opening business bank accounts, Pierre mailed two cashier's checks totaling

$75,000 which were to be paid to the order of CLS Capital Group Inc and contained the routing number and the business account number ending in xxx8843 with Fifth Third, which Uballe provided when he instructed Pierre to sent a wire transfer.

37. Upon information and belief, the money should still be in the escrow account or the account ending in xx8843, instead of being cashed by Uballe, who was merely pretending to be an officer of the non-existing lender or finance company.

38. When Pierre discovered that it was a victim of financial fraud, Plaintiff filed suit in Lucas County Common Pleas Court. The case is expecting a decision from the Sixth Appellate Court this summer.

39. At trial, Uballe testified that he deposited the funds and then withdrew the $75,000. He denied placing the funds in an escrow account. Upon information and belief, neither CLS Capital Group Inc or Uballe intended to perform, nor were they in any financial capacity to perform the $10 million dollar loan. The transaction was a fraudulent scheme from its inception.

40. In reliance of the representation that CLS Capital Group Inc was in business from the possession of a bank account at Fifth Third, Plaintiffs secured a land purchase agreement in Texas and intended to develop the land and construct residential homes on the real estate. Plaintiffs wasted hours of time and resources meeting with city engineers and architects.

41. Due to the failure of Fifth Third to screen its customers and due to the lack of due diligence in verifying whether Delaware based foreign company CLS Capital Group Inc is even a business, Plaintiff lost its project opportunity and lost profits and investment money.

11

42. During discovery in the Lucas County case, Plaintiff discovered a 10K report on EDGAR that had been submitted to the Securities and Exchange Commission which indicated that CLS Capital Group Inc had only $120 dollars in assets prior to being shut down in 2012.

43. On or about April 1, 2016, Uballe through assistance of his Ohio attorney opened an escrow account at Fifth Third at the Toledo branch as if Uballe was a director of CLS Capital Group Inc and was in need of an escrow account. (Exhibit 1, p. 5)

44. Upon information and belief, the vice president of Fifth Third in Toledo in 2016 was Brian C. Reid. (Exhibit 1, p. 20)

45. Prior to opening the account, Fifth Third was required to verify that CLS Capital Group Inc, which was once a foreign corporation out of Delaware, was still in existence and in good standing. If Mr. Reid had checked with Delaware SOS, he would have found that CLS Capital Group Inc was not in existence since 3/1/2012. (Exhibit 2)

46. Instead, Fifth Third merely checked Ohio Secretary of State records and assumed that since Ohio showed the Delaware corporation to be active in Ohio as a "foreign" corporation, that it was also active in Delaware.

47. If Fifth Third had asked Uballe for proof that he was still associated with CLS Capital Group Inc, Uballe would have had no verification as there has been no votes and no corporate minutes since it shut down in 2012. (Exhibit 3: Trial Transcript of Proceedings, Pierre Investments, Inc. v CLS Capital Group Inc et al. -See Sixth Appellate District Lucas County, Case number G-4801-CL-0202101229-000 filed 01/04/2022.)

48. When required by resolution, second office of Customer would have also signed the Master Treasury Management Agreement on behalf of CLS Capital Group Inc.

49. In addition to the signature of Mr. Reid as vice president, the "Assistant Vice President" at the time would have had to sign the "Signature Page to the Master Treasury Management Agreement" also. (Exhibit 1, p. 20)

50. Upon information and belief, the assistant vice president was Julie Kristenak. (Exhibit 1, p. 20)

51. Two bank officers were required to sign off to permit Uballe to open a business account with the bank.

52. Neither officer did their reasonable due diligence as was required under the federal reserve bank system and or the Securities and Exchange Commission and or the IRS.

53. If the officers had checked EDGAR, the SEC website, they would have discovered that the SEC revoked CLS Capital Group Inc.

54. If the officers had checked with EDGAR, they would have discovered that the employer identification number ("EIN") being used by Uballe matched the EIN used by defunct CLS Capital Group Inc until 2012 as it was on the first page of every filing with the SEC.

55. If the officers had checked with the IRS or the Lucas County Recorder records, they would have discovered that CLS Capital Group Inc was out of business for failure to pay taxes and or file taxes for several years and was a defunct company.

56. At any time from 2016 through 2022, if Mr. Reid or Defendant Fifth Third or the new vice president had checked Delaware SOS records, it would have discovered that CLS Capital Group Inc is not in good standing and its non-existence since 3/1/2012.

57. According to the Deposit Account Resolution, the Bank is "Resolved Further, that the Bank is authorized to rely upon the foregoing resolution until receipt by Bank of written notice of any change or revocation."

58. Upon information and belief, the bank has not acted on written notice of the revocation because it has been merely checking Ohio Secretary of State records. The Ohio SOS relied upon Helen Odum, as secretary of CLS Capital Group Inc to inform the Ohio Secretary of State in 2012 that the company was out of business, instead of ever checking Delaware Secretary of State records in 2012-2022.

59. On or about 11/13/2018, Uballe presented the cashiers checks to Defendants and cashed them.

60. The existence of a fake bank account and the perception that a man with a business account is a legitimate businessman and is a verified customer of Defendants that could lawfully manage escrow deposits and proceeds misled Plaintiffs.

61. True copies of the Cashiers checks with CLS Capital Group Inc on the face of the instruments, along with the account number, are attached hereto and incorporated herein. (Exhibit 4)

62. After discovering that Fifth Third had allowed the cashiers checks to be deposited into an account ending in XXX8843 that was open for the defunct corporation, Pierre asked Fifth Third for an accommodation to retrieve the $75,000. (Exhibit 5)

63. Fifth Third failed to provide an accommodation for Pierre or join the case that was pending as *Pierre Investments, Inc v. CLS Capital Group Inc*, et al in Lucas County Common Pleas court.

64. Upon information and belief, Uballe deposited hundreds of thousands of dollars into the account yearly through the SWIFT code linked to Defendant Fifth Third in Toledo, Ohio.

65. Upon information and belief the account with the name CLS Capital Group Inc is still open with Defendants.[1]

66. The $75,000 has not been returned to Capital One Bank as the issuer of the cashiers checks.

67. Defendant Fifth Third has failed to properly verify whether out of state corporations are in good standing prior to giving them a business checking account and accepting them as a customer.

68. Defendant Fifth Third has failed to properly verify whether out of state corporations have a current director or co-director prior to authorizing self-appointed individuals to act as if they were voted to their director position or as if they had bought the corporation from the co-directors who were in charge when the business closed, prior to approving their signature on the signature card associated with the business checking account.

69. This negligence causes financial loss to Americans, businesses and the government because out of state businesses which do business in Ohio, with corporations that have their charter outside of Ohio are misled whenever unsuspecting victims assume that if a business has a business account (like the one here at Fifth Third) that the business is licensed to do business in their home state and in Ohio.

70. Since the Patriot Act was in force from 2012 to 2021, Americans have relied on the extra caution by banks to catch suspicious individuals pretending to be directors of corporations.

71. Fifth Third had a duty to Americans to verify whether out of state businesses had any directors before opening a new checking account.

---

[1] Uballe testified in September 2020, that he had opened an account with JP Morgan Chase Bank also.

72. By failing to verify, Defendants have allowed an individual to pretend to be in business as a corporation even though the corporation is defunct, non-operative and non-existent.

73. By failing to verify, Fifth Third has allowed an individual to open a business checking accounts without authority and or without a valid employer identification number.

74. After failing to verify, Fifth Third has allowed an individual to be named on an escrow account as part of an IOLTA account. (Exhibit 1, p. 5)

75. After failing to verify, Fifth Third has sent "Account Analysis Invoices" to "CLS Capital Escrow Account in care of a law firm's IOLTA account. (Exhibit 1, p. 5)

76. Upon information and belief, Fifth Third Bank (Northwestern Ohio) was a National Association bank.

77. All National banks are under the Office of the Comptroller of the Currency "OCC".

78. In December 29, 2000, Fifth Third Bank (Northwestern Ohio) merged into Fifth Third Bank and ceased doing business as Fifth Third Bank (Northwestern Ohio).

79. In December 2016, Fifth Third Bank (Northwestern Ohio) was still sending "Account Analysis Invoices" to its customers. (Exhibit 1, p. 5)

80. Fifth Third has a duty to Americans to report suspicious persons who try to open business checking accounts without authority or a valid employer identification number.

81. Fifth Third could foresee that third-parties like the plaintiff would suffer financial losses if the bank or its officers failed to verify the information given by individuals who attempt to open accounts with the name of a corporation.

82. On the "Deposit Account Resolution" form (Exhibit 1, p. 7) there is a section for corporations which states:

The undersigned certifies that they are the Secretary of _____

(Name of corporation)

16

("Company") and at a meeting of the Board of Directors held on the __day of _____, yr _____at which a quorum was present these resolutions were duly adopted. The undersigned certifies that the foregoing is a true copy of the resolutions so adopted; that such resolutions are still in full force and effect an <sic> unrevoked as of this date; and that such resolutions do not violate any charter or bylaw provision of this Company.
IN WITNESS WHEREOF the undersigned has set his/her hand on the ____day of ____, yr _____.

_____
Secretary Signature

83. Upon the testimony of Uballe in *Pierre Investments, Inc. v. CLS Capital Group Inc*, Uballe has no knowledge of the Secretary's address or phone number and referred to her as a long-gone employee.

84. Upon information and belief, according to the SEC filings on EDGAR, the Secretary of CLS Capital Group Inc was Helen Odum.

85. Upon the testimony of Uballe in *Pierre Investments, Inc. v. CLS Capital Group Inc*, there have been no resolutions since the company closed years ago.

86. Under the 10th amendment to the United States Constitution, "powers not delegated to the United States by the Constitution, not prohibited by it to the States are reserved to …the people" therefore, Plaintiff has standing to sue Fifth Third for the damages incurred.

87. Uballe pretended to have ten million dollars ($10,000,000) to lend on behalf of CLS Capital Group Inc, but CLS Capital Group Inc was not a legitimate lender.

88. Having a bank account at Fifth Third gave the appearance that CLS Capital Group Inc was in business when it was not.

89. Due to the $85,000 being tied up with CLS Capital Group Inc , Plaintiff lost the opportunity to enter into a valid contract with a legitimate lender that had the ability to lend the $10 million dollars needed to develop the acreage in which he planned to build

several homes that would have been valued at $650,000 each near Dallas because the investment money was tied up with Uballe.

90. Plaintiff lost the opportunity to build homes which would have been started in 2019 and finished in 2021 just prior to the housing boom in the Dallas Metroplex.

91. Plaintiff lost the opportunity to complete the projects in 2021 which would have netted around 45 million dollars in profits.

## Count 1: Common Law Negligence

92. Pierre hereby incorporates by reference paragraphs 1 through 91 above.

93. If Fifth Third followed its own procedures to verify whether or not a Delaware company is in good standing with the Delaware Secretary of State, no account would have been open with the name CLS Capital Group Inc on it.

94. If Fifth Third followed its own procedures, the cashiers checks totaling $75,000 in funds that belonged to Pierre would have been returned to Capital One Bank in Texas, instead of cashed based on the existence of the Fifth Third account ending in #XXX8843.

95. Plaintiff is asserting a third party cause of action for professional negligence against Defendants Reid and Kristenak due to negligent misrepresentation as they negligently communicated false information which led Pierre to believe that CLS Capital Group Inc was a corporation based in the United States with the ability to lend Pierre $10 million dollars to build luxury homes in Texas. This information was false because CLS Capital Group Inc has been out of business since 2012 and can not transact business in Ohio in spite of the fraudulent bank account it was able to open up with Fifth Third as if it were in business. The special circumstances such as fraud, or bad faith, or collusion or other malicious conduct against Pierre as the customer of a lender (CLS Capital Group Inc) in

competition with Fifth Third opened up Fifth Third and its officers and its bankers to third-party liability for the misrepresentations due to its errors and omissions for which it is professionally liable for just as other professionals can be found liable in the legal profession. (For example, See *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, *Scholler v Scholler*, 10 Ohio St.3d 98, 10 Ohio B, 426, 462 N.E.2d 158 (1984), paragraph one of the syllabus; *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987).

96. Defendants' fraudulent confirmation of business "OPEN" status and assurances that CLS Capital Group Inc was actually a "business" open for business in Ohio, in part through access to a business checking account and SWIFT code numbers constitute special circumstances where a professional can be liable to third parties for negligent misrepresentation for negligently communicating false information like negligence addressed in *Shoemaker*, *Scholler* and *Simon*.

## COUNT II: Respondeat Superior

97. Pierre hereby incorporates by reference paragraphs 1 through 96 above.

98. Fifth Third employed Brian C. Reid ("Reid") and employee #E957851 at its Toledo bank in November 2018.

99. Brian C. Reid was a supervisor to employee # E957851 aka #957851.

100. Employee #E957851 permitted Reynaldo Uballe, Jr to cash or deposit two cashier's checks as if he were a signer for the defunct corporation.

101. Employee #957851 cashed or deposited the cashiers checks based on the presenter being a "signer" on account ending in xx8843.

102.     Upon information and belief this checking account xx8843 was opened in 2016, which is about 4 years after CLS Capital Group Inc became defunct in 2012 according to the *Delaware* Secretary of State website.

103.     Upon information and belief the employee that opened checking account xx8843 in 2016 failed to verify whether the Employer identification number ending in X7715 belonged to a defunct Delaware Corporation or a Delaware Corporation in good standing.

104.     Upon information and belief employee that opened checking account xx8843 in 2016 failed to verify whether the EIN ending in X7715 belonged to a defunct Delaware Corporation or a Delaware Corporation in good standing.

105.     Upon information and belief, Reid signed page 13 of the Master Treasury Management Agreement which is required whenever a new account is opened.

106.     Defendant Fifth Third is responsible under respondent superior for the negligent act of the employee or bank officer who allowed Uballe to cash the cashiers checks based on the checking account ending in xx8843 at Fifth Third in Toledo, Ohio.

107.     Defendant Fifth Third is responsible under respondent superior for the negligent acts of the employee and bank officer who failed to follow the KYC/AML steps needed to know your client to prevent money laundering when the account was opened in 2016.

108.     Defendant Fifth Third is responsible under respondent superior for negligent acts that enabled Uballe to have access to a SWIFT code to use in money laundering and for sending thousands of dollars out of the United States even though he is no longer with CLS Capital Group Inc because it is non-operative since 2012.

109.     Defendant Fifth Third is responsible for the $75,000 in funds if the funds were

sent to another account by a SWIFT code instead of being held in escrow until the dispute

is settled in the courts.

**COUNT III: Negligence in failing to request signature of Helen Odum as
Secretary of the defunct Corporation prior to opening the corporate account**

110.     Plaintiffs hereby incorporates by reference paragraphs 1 through 109 above.

111.     Defendant Fifth Third violated the rules of the Patriot Act/Anti-Money

Laundering Act, Anti-Terrorist Funding Act,  when it failed to verify the existence of

CLS Capital Group Inc in its home state of Delaware.

112.     Defendant Fifth Third is responsible for damages from opening the checking

account for a defunct corporation and for allowing Uballe to sign on a corporate checking

account since he has not been a co-director of that corporation since 2012.

113.     Upon information and belief, the former directors never reconvened to vote after

the  corporation went out of business in 2012, so no one promoted Uballe to president.

114.     Upon information and belief, the former directors never reconvened to vote after

the  corporation went out of business in 2012, so no one voted to sell the corporation to

Uballe.

115.     Defendant Fifth Third is responsible for $45 million in lost income, $3 million in

lost profit, lost $75,000 funds, $10,000 earnest money and the lost opportunity to

complete the real estate construction project in Texas.

**WHEREFORE**, under count III, Plaintiffs request the court find that Pierre Investments,

Inc and Pierre Investments, Inc doing business as Gehard Luxury Homes be awarded

$45,000,000 in lost proceeds and reasonable attorney fees in this lawsuit, along with the

legal expenses of the case in Lucas County, and recover the $75,000 that was deposited

into an account that should have never been opened in the first place, and other damages

resulting from the theft of Plaintiff's funds by Uballe.

### <u>COUNT IV</u>: Negligence from failure to ask the questions required under the USA Patriot Act of 2001 required on the Signature Card

116.    Pierre hereby incorporates by reference paragraphs 1 through 115 above.

117.    Defendant Fifth Third violated the rules of the Patriot Act Public Law 107-56 by

failing to use the tools meant to intercept and obstruct terrorism mentioned in the US

Patriot Act of 2001, since without a valid EIN, Fifth Third cannot determine if Uballe is a

Senior Foreign Official of a government branch, military branch, political party, foreign

government-owned company, or a close personal or professional associate of one of

these.

118.    Upon information and belief, it is the policy of Fifth Third to check the

Identification of the individual opening the bank account for the corporation and check

the EIN number of the corporation. (Exhibit 1, p. 6, lower right hand box re: verification)

119.    If the bank had investigated the company by running it through Qualifile as Fifth

Third required, this investigation would have likely revealed that the company is out of

business since 2012. (Exhibit 1, p. 6, lower right hand box re: verification)

120.    If the bank had investigated the company by verifying the address on file, it

would have seen that the former agent in the state of Delaware had no address for the

defunct corporation on file.  (Exhibit 1, p. 6, lower right hand box re: verification)

121.    Since CLS Capital Group Inc is defunct, any individual attempting to use the old

EIN number is using a fake EIN from a defunct company, instead of the actual company

that it is doing business for when banks like Fifth Third allow and individual to open an

account as if it were still in business.

122.      On or about September 20, 2021, Uballe testified that he only has two checking accounts. One at Fifth Third and one at JP Morgan Chase Bank.

123.      According to the website published on www.momentumfinancialgroup.com Uballe has over $500,000 on deposit or invested with Fifth Third and or JP Morgan Chase bank and or Citibank etc. This money came from Momentum Financial Group[2].

124.      According to the MFG website: Momentum Financial Group LLC is pleased to announce that it has invested €500 million[3] with CLS Capital Group Inc., (CLS Capital Group Inc), a Delaware Corporation, was formed in 1993 initially as a mortgage lender and broker. CLS has since ventured into other areas of finance. Through its strategic alliance with numerous venture capital funds, private equity firms, investment banks, top financial institutions, and accredited investors, CLS has virtually any solution for any funding request." (See https://momentumfinancialgroup.com/f/cls-capital-group-inc-secures-%E2%82%AC500m (Website last accessed 3-14-2022)

125.      Defendant Fifth Third failed to check Delaware Secretary of State records prior to opening the business checking account in 2016.

126.      Defendant Fifth Third failed to check Delaware Secretary of State records again in 2017.

127.      Defendant Fifth Third failed to check Delaware Secretary of State records again in 2018.

128.      Defendant Fifth Third violated the rules of the Patriot Act Public Law 107-56 by allowing Uballe to cash or deposit two cashiers checks issued by Capital One Bank totaling $75,000.

---

[2] Employees former co-director Redell Vince Napper
[3] $545,911,150 in US Dollars

129.      Defendant Fifth Third is responsible for reasonable attorney fees in Plaintiffs'

attempt to recover the $75,000 along with other damages, which include the $45 million

dollars in expected proceeds to Pierre Investments, Inc and Gehard Luxury Homes which

was not possible after the loss of $85,000 cash.

### COUNT V: Negligence in failure to follow Federal Reserve and OCC rules requiring verification of the identity of account holders

130.      Pierre hereby incorporates by reference paragraphs 1 through 139 above.

131.      Defendant Fifth Third violated the rules of the Federal Reserve when it allowed

Uballe to open up a checking account for CLS Capital Group Inc in 2016.

132.      Defendant Fifth Third violated the rules of the Federal Reserve when it allowed

Uballe to have a bank account for CLS Capital Group Inc in 2017.

133.      Defendant Fifth Third violated the rules of the Federal Reserve when it allowed

Uballe to have a bank account for CLS Capital Group Inc in 2018.

134.      Defendant Fifth Third violated the rules of the Office of the Comptroller of the

Currency (OCC) when it allowed Uballe to continue to have access to a business

checking account of defunct CLS Capital Group Inc in 2019.

135.      Defendant Fifth Third violated the rules of the Office of the Comptroller of the

Currency (OCC) when it allowed Uballe to continue to have access to a business

checking account of defunct CLS Capital Group Inc in 2020.

136.      Defendant Fifth Third violated the rules of the Office of the Comptroller of the

Currency (OCC) when it allowed Uballe to continue to have access to a business

checking account of defunct CLS Capital Group Inc in 2021.

137.     Defendant Fifth Third violated the rules of the Office of the Comptroller of the
Currency (OCC) when it allowed Uballe to continue to have access to a business
checking account of defunct CLS Capital Group Inc in 2022.

138.      Defendant Fifth Third is responsible for reasonable attorney fees in Pierre's
attempt to recover the $75,000 that was fraudulently labeled a Commitment Fee. (See
appeal G-4801-CL-2-21-1229-000)

139.     Uballe admitted that he had used old versions of templates used by CLS Capital
Group Inc to fabricate contracts in 2018 as if he was still in business in the state of
Delaware.

140.     From 2012 to 2019, Uballe hid the CLS Capital Group Inc lending contracts from
investigators because he knew that the SEC ruling prohibited him from acting as if CLS
Capital Group Inc was still in business. (Exhibit 6: Securities and Exchange Commission
Decision)

141.     Defendant Fifth Third is responsible for mental anguish, loss of business
opportunity, and loss of over forty-five million dollars ($45,000,000.00) of proceeds that
were expected from a housing construction project which Pierre and the city council
members were led to believe had been funded as a viable project based on the
misrepresentations that were made possible by defendant Fifth Third by its negligent acts.
These acts made the defunct corporation appear to be a corporation that was actually in
business-- when it had been cancelled due to nonpayment of taxes and officially removed
from the Securities and Exchange Commission list of corporations.

142.     But for the negligence of Fifth Third, this fraud on Plaintiffs would not have
occurred.

25

143.    If the CLS Capital Group Inc checking account would have never been opened after the corporation became inoperative in 2012, this fraud on the Plaintiffs in 2018 would not have occurred.

144.    Defendant Fifth Third failed to do its due diligence and misled Pierre and other non-suspecting victims by assigning a checking account number to CLS Capital Group Inc that Fifth Third was doing business with a legitimate corporation when it opened a checking account for CLS Capital Group Inc.

145.    Defendant Fifth Third failed to do its due diligence and misled Pierre and other non-suspecting victims by assigning a checking account number to CLS Capital Group Inc that Fifth Third was doing business with a legitimate corporation when it continued to allow a checking account to remain open --year after year-- even though it had been out of business since 3-1-2012.  Therefore, Defendants are liable to Plaintiffs for $45 million dollars in lost proceeds, profits, and income.

**Count VI: Public Policy**

146.    Pierre hereby incorporates by reference paragraphs 1 through 145 above.

147.    New bank employees, business people and lawyers from Ohio and other states are relying on the information found in the Ohio Secretary of State website and are often careless when looking at the website to determine if a corporation is in good standing.

148.    Searchers do not always catch references to "foreign" charters that one must verify in the home state, but bank officers are BSA Officials that are trained and know that this needs to be verified before accounts are opened to know for sure. Therefore, the public policy requires that all banks have a written procedure in place with a process to detect defunct corporations, and report to the public whenever a person tries to pretend

that they are a business in good standing when they are actually defunct. The banks must

comply by providing ongoing associate training and independent audit testing of all out

of state corporations to prevent financial crimes. This public policy is needed so

that banks can verify the good standing of Delaware corporations and other out of state

corporations --before opening a bank account. To do otherwise will result in

fraud, money laundering and financial crimes.

### 1.  **Relationship Between the Parties**

Plaintiff concedes that there was no relationship between the bank and Pierre

when the fraud occurred. Because there was no relationship, this factor does not lean

toward a finding of a duty. According to the Ohio Secretary of State website has the

purpose of CLS Capital Group Inc is blank check. Fifth Third should have questioned

how CLS Capital Group Inc could actually be a lender with only $120 in their account in

2010. (See 10K Report, EDGAR, Securities and Exchange Commission. 2010)

### 2.  **Social Utility of the Bank's Conduct**

Paul Dougherty is the Fifth Third Financial Crimes Director. In a recent report he stated:

"As required by law, Fifth Third has appointed a Bank Secrecy Act (BSA) Officer who is

responsible for compliance with AML <Anti-Money Laundering> and Economic

Sanctions Compliance program, which includes: written procedures; processes and

systems to detect, analyze, and report potentially suspicious activity; processes and

systems to prevent, detect, and report economic sanctions violations; processes to

maintain required records, on-going associate training and independent audit testing."

(Exhibit 7) Therefore, Fifth Third BSA Officer was responsible for detecting suspicious

activity before this fraudulent bank account ending in XXX8843 was opened by checking

27

with the home state of Delaware to determine if the company was in good standing. If the BSA Officer had checked the Delaware Secretary of State records in 2016 or at any time after that, he would have found that the company went out of business in 2012.

Mr. Reid as vice president of the bank also had the ability to verify whether the business was in good standing in the state of Delaware Secretary of State or with the Securities and Exchange Commission. Either one of these inquiries would have resulted in knowledge that CLS Capital Group Inc has been out of business since 2012.

### 3.  <u>The Nature of the Risk</u>

The third factor requires the court to consider both the nature of the risk and the foreseeability of the harm. Phillips, 841 A.2d at 1010. Duty arises when "one engages in conduct which foreseeably creates an unreasonable risk of harm to others." R.W. , 888 A.2d at 747. There is a risk to all Americans when a bank, such as Fifth Third,  opens a bank account for a business customer without knowing for sure, if the business is even still in business. The BSA Officer of each bank is adequately trained to understand how to determine if a company is still in business in its home state. To do this, they must first check the Ohio Secretary of State website to see if the company has ever registered in Ohio. Whenever the Secretary of State identifies a company as being "foreign" the BSA or bank officer must to go to the website of the Secretary of State in the home state to determine if the company is still in good standing. The bank can not rely on the information in the Ohio Secretary of State website as this information is not updated

unless the secretary of the corporation notifies the Ohio Secretary of State that they are out of business.

If Fifth Third had checked with the Delaware Secretary of State before opening the account for CLS Capital Group Inc it would have become aware that CLS Capital Group Inc has been out of business since 2012.

As a publicly traded company (symbol=FITB) corporation that attempts to comply with "all applicable laws and regulations regarding money laundering, economic sanctions, terrorist financing, and other financial crimes. Fifth Third Bancorp, and its wholly-owned subsidiary, Fifth Third Bank, National Association, (collectively Fifth Third) have an Anti-Money Laundering (AML) and Economics Sanctions program regulated by the Federal Reserve Bank of Cleveland and the Office of the Comptroller of the Currency (OCC), respectively. (Exhibit 7)

Since the BSA officer of Fifth Third is familiar with the requirements to be a publicly traded company, he is already equipped to check the EDGAR site to determine if a company is in good standing.

If Fifth Third had checked the EDGAR website before opening the account for CLS Capital Group Inc it would have become aware that the SEC shut down CLS Capital Group Inc many years before Uballe and or his attorney came in to open an account.

### The foreseeability of the Harm Incurred

Some Fifth Third tellers are aware that fraud activity is often perpetrated by criminals who fraudulently open bank accounts in false names. Fifth Third has been aware of this kind of activity since the Patriot Act was passed in 2001. At times, the Federal Bureau of Investigation warned Americans by issuing public service

29

announcements. The American Bankers Association has issued publications to help prevent fraud, but fraud continues at an alarming rate. Fraudsters are relying on the fact that if they register their foreign corporation in Ohio and go out of business in Delaware the following month, that no one will discover that they are not licensed to do business in Ohio. Banks know this, but still do not check with out-of-state Secretary of State offices to determine if a corporation is in good standing. They merely rely on the fact that over 10 years ago they were once licensed in Ohio to do business as a foreign corporation. Most people are not trained to know that if a out of state corporation loses their license in their home state that it is automatically revoked in Ohio. Fraudsters can open up various corporations throughout the US and pretend to be successful business people. Until Ohio puts a stop to the ability of fraudsters to get away with this through this loophole, fraud will continue.

### Consequences of Imposing the Duty on the Banks

There is no extra burden placed on banks to check to see if these out of state businesses are defunct before accounts are opened and yearly thereafter. There should be a clearing house that notifies banks throughout the US that a company has died, just as there is a system in place with the social security office to let the public know that a person has died.

### The Overall public interest in the proposed solution

"It's in the public interest that we give effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson II*, 976 F.3d at 619, 2020 U.S. App. LEXIS 29602, at *15 (quoting *Thompson I*, 959 F.3d at 812). (See League of Women Voters of Ohio v. LaRose, 489 F.Supp.3d 719 (S.D.Ohio 2020). Laws

such as the Patriot Act were passed to protect America and Americans from becoming victims of financial crimes, fraud and foreign terrorists. These laws do not work as they should when bankers act negligently. Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Walters v. UPMC Presbyterian Shadyside*, 646 Pa. 746, 187 A.3d 214, 221 (2018) (quoting *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 462 (1998)).

Fifth Third owes a duty of care when opening an account under the Restatement of Torts (1934) and Restatement of Torts (1965) which have been adopted by the Ohio Supreme Court. Alternatively, the court should apply the test currently used in Pennsylvania which imposed previously-unrecognized duties known as the Althaus factors. If a common law duty under the Restatement (Second) of Torts applies then an analysis like the Althaus analysis is not needed.

"Claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward.") *Fragale v. Wells Fargo Bank, N.A.*, 480 F.Supp.3d 653 (2020). The negligence seen in this case is similar to the case of *Ken Gazian et al v. Wells Fargo Bank, et al.*, 2:13cv-13-1312-DGC. Banks are seen as doing well when they have more accounts and more funds in these accounts. Since we can not tell if the money being placed in fake business accounts is drug money, cartel money or terrorist funds, banks should check with Delaware if the business has Delaware as its home state before opening up a checking account for the business. Delaware will issue a certificate of good standing if the company is in good standing. If it is not in good standing, Delaware Secretary of State will provide a certificate showing that it is not.

31

## Count VII: AGENCY AND VICARIOUS LIABILITY

149.      Pierre hereby incorporates by reference paragraphs 1 through 148 above.

150.      If account number ending in #xx8843 is actually and escrow account, the escrow

agent is responsible for a full accounting of the $75,000 and a return of the funds.

151.      At all times relevant to this lawsuit Defendants through their agents,

representatives, or employees took responsibility and were responsible for the acts of

Defendants and their agents, representatives or employees within the scope of the actual

or apparent authority of Defendants. Defendants are therefore liable to Plaintiffs for the

acts and/or omissions of any such agent, representative or employee of Defendants by

virtue of such agency relationship.

152.      Whenever in this complaint it is alleged that a Defendant did any act or thing or

omission, it is meant that Defendants, through their agents, officers, employees, or

representatives did such act or thing or omission, and that at the time such actor or thing

was done, it was done with the full authorization or ratification of Defendants or was

done in the normal routine, course and scope of employment of Defendants' agents,

officers, servants, employees, or representatives.

153.      At all relevant times Plaintiffs understood CLS Capital Group Inc to hold either a

corporate account with Fifth Third or an escrow account with Fifth Third as part of a

business enterprise with the Mockensturm Ltd law firm. Plaintiffs understood and

believed, and were led by Fifth Third to believe that representations made by Reid that

CLS Capital Group Inc must be in business otherwise it would not have a business

account or an escrow account were attributable to all of them. Plaintiffs further

understood Uballe and or CLS Capital Group Inc to use the Mockensturm Ltd escrow

32

account as a holding place for escrow funds. Plaintiffs do not know if there was an attorney client relationship between Mockensturm Ltd and Uballe. Since CLS Capital Group Inc is not in business, there can be no attorney-client relationship with Mockensturm Ltd.

154.     Since CLS Capital Group Inc is not in business, there should be no checking account at Fifth Third in which Uballe or CLS Capital Group Inc is able to do business.

155.     These representations made by any one of them were attributable to all of them.

156.     Plaintiffs understood that checking accounts for Delaware based corporations requires a check of Delaware Secretary of State records.

157.     A review of Delaware Secretary of State records would have revealed that CLS Capital Group Inc was out of business since March 1, 2012.

158.     A review of Delaware Secretary of State records would have revealed what kind of business CLS Capital Group Inc used to do as a lender.

159.     The EDGAR website of the Securities and Exchange Commission put Fifth Third on notice that the SEC was trying to protect Americans from criminal activity.

160.     Upon information and belief, Fifth Third ignored the public notice provided by the SEC and opened a bank account with the name CLS Capital Group Inc in 2016 and is therefore liable for the 45 million dollars in lost proceeds, profits and income.

### Count VIII: FRAUDULENT MISREPRESENTATION
### (All Defendants)

161.     Plaintiffs reallege and incorporate paragraphs 1-160 above.

162.     Plaintiffs allege that the acts, omissions, and misrepresentations by Defendants constitute actual and constructive fraud. The Fifth Third Defendants, by their own actions and/or actions of their agents and employees, including but not limited to Reid, Kristenak

33

and employee # 957851, assisted in a scheme by which they falsely represented that CLS

Capital Group Inc was able to engage in legitimate business transactions with Pierre as an

investment company and for the purchase of land on which Pierre and Gehard and Gazian

would profit and earn income from the construction projects of Gehard Luxury Homes.

Plaintiffs further allege that the Fifth Third Defendants made additional material

representations as described above in this Complaint.

163.     Plaintiffs allege that Fifth Third made representations that the transactions for the

purchase of land on which the homes were to be built were legitimate based on CLS

Capital Group Inc being "in business" as seen through CLS Capital Group Inc having

access to a business checking account and or escrow account.

164.     Mockensturm Ltd stated that they had done business with CLS Capital Group Inc

before and that Uballe was a reputable businessman, and that CLS Capital Group Inc

could fund the 10 million dollar loan as the lender as referred to in a Commitment

agreement. Plaintiffs further allege that in the event that the trier of fact determines that

the account at Fifth Third was not an escrow account, that Fifth Third and CLS Capital

Group Inc and Mockensturm Ltd misrepresented the role of Fifth Third in the

Commitment because at all times, Fifth Third was to be the bank used to receive the

$75,000 per the Commitment agreement.

165.     Plaintiffs are informed and believe and based thereon allege that these

representations were false. Plaintiffs further allege that in the alternative, Defendants

made these representations recklessly, as a positive assertion, and without knowledge of

their truth. Plaintiffs are informed and believe and based thereon further allege that

Defendants made these representations with the intent that Plaintiffs act on them.

Plaintiffs are informed and believe and based thereon further allege that Defendants knew or could reasonably conclude that Plaintiffs were relying on their representations based, among other things, on Pierre's noting the Fifth Third account number on both cashiers checks.

166.     Plaintiffs, at the time these representations were made by Defendants, were ignorant of the falsity of the representations and believed them to be true.  In reliance on these representations, Plaintiff proceeded as if the transactions were legitimate and transferred funds to the Defendants for these transactions, and took other actions in performance of these transactions included but not limited to the retention of escrow, attendance at council meetings, and retention of real estate services and an attorney in Texas.

167.     As a direct and proximate result of the representations made by Defendants, Plaintiffs have suffered loss and damages as described in this Complaint, in an amount to be proven at trial. Plaintiffs further content that they are entitled to exemplary or punitive damages under Section 2315.21, $45 million in lost proceeds, profits and lost wages, and emotional distress.

### Count IX: FRAUDULENT INDUCEMENT

168.     Plaintiffs reallege and incorporate paragraphs 1 through 167 above.

169.     Plaintiffs allege that the acts, omissions, and misrepresentations by Defendants constitute actual and constructive fraudulent inducement. The Fifth Third Defendants, by their own actions and/or the actions of their agents and employees, and account holders including but not limited to CLS Capital Group Inc and Uballe, orchestrated a scheme by which they false represented that CLS Capital Group Inc was engaging in legitimate

business transactions to lend funds for the for the purchase of land and the development of luxury homes for Gehard Luxury Homes. Plaintiffs further allege that the Fifth Third Defendants represented that CLS Capital Group Inc had a valid business checking account by providing CLS Capital Group Inc with a SWIFT code and with a bank account to which CLS Capital Group Inc could deposit funds. Plaintiffs further allege that the Fifth Third Defendants made additional material representations as described above in this Complaint.

170.    Plaintiffs allege that Fifth Third made representations that the transactions for CLS Capital Group Inc as a "blank check" corporation would be valid by providing CLS Capital Group Inc with an account under the name of CLS Capital Group Inc were legitimate transactions, that Fifth Third had done business with CLS Capital Group Inc before when it opened an escrow account under the IOLTA account of Mockensturm Ltd, that the $75,000 would be accounted for and that Fifth Third's deposits were federally protected against bank failure or theft up to $250,000. Plaintiffs further allege that in the event the trier of fact determines that Fifth Third was not a guarantor of the $75,000 deposited or cashed at Fifth Third, that Fifth Third misrepresented its role in allowing CLS Capital Group Inc to have its name on an account at Fifth Third.

171.    Plaintiffs are informed and believe and based thereon allege that these representations were false when made, and that Defendants knew that these representations were false. Plaintiffs further allege that in the alternative, Defendants made these representations recklessly and without knowledge of their truth even though the SEC notified Fifth Third and Fifth Third securities of its decision to close down CLS

36

Capital Group Inc to protect investors like Plaintiffs from being victims of criminal activities by the shell corporation.

172.     Plaintiffs are informed and believe that Defendants made their promises to perform as an escrow account or a business checking account, without the intent to perform such business services as CLS Capital Group Inc was not in business and could not legally receive banking services from Defendants.

173.     Defendants had notice of Uballe's felonies and foreclosures from 2006 to 2016 prior to opening this bank account because these cases and the bank branch where Uballe opened the fake business account were in all in Lucas County.

174.     In 2017, Uballe claimed to be a victim of the financial crisis that began in the years 2007 and 2008 and that is why Mr. Uballe "lost his employment" in the banking business. (See Lucas County foreclosure CI-0201204426, filed in 2012 against Uballe and his 2017 request to add the Internal Revenue Service as a lienholder. (Memorandum in Support of Jurisdiction, Ohio Supreme Court case No. 2017-1607, p. 12)

175.     Plaintiffs are informed and believe and based thereon further allege that Defendants knew or could reasonably conclude that investors such as Pierre and builders such as Gehard Luxury Homes and individuals such as Ken Gazian would rely on their representations based, among other things, on Plaintiffs' inclusion of the Fifth Third account number and routing number on both Cashiers checks.

176.     Plaintiffs, at the time these representations were made by Defendants, were ignorant of the falsity of the representations and believed them to be true. In reliance on these representations, Plaintiff proceeded as if the transactions were legitimate, entered into a commitment and related real estate contract, mailed cashiers checks through UPS

37

service with the Fifth Third account number and routing number on the face of the checks

to the account holder CLS Capital Group Inc-- to the address on the fake contract which

was then presented to Defendants' bank-- and took other actions in performance of these

transactions including entering into a real estate contract to buy 10 acres in Texas on

which to build the Gehard Luxury Homes project.

177.    Had Plaintiffs known the actual facts, they would have acted differently to protect

their interests. Had Plaintiffs known the actual facts, they would have never entered into a

commitment with Uballe as if he were CLS Capital Group Inc or used the UPS to mail

cashiers checks or entered into an agreement to buy 10 acres in Texas on which to build

the luxury homes. Plaintiffs' reliance on the representations made by Defendants was

justified, and Plaintiffs had every reason to rely on the representations made by

Defendants.

178.    As a direct and proximate result of the representations made by Defendants,

Plaintiffs have suffered loss and damages as described in this Complaint, in an amount to

be proven at trial. Plaintiffs further contend that they are entitled to entitled to exemplary

or punitive damages under Section 2315.21, $45 million in lost proceeds, profits and lost

wages, and emotional distress.

### Count X: NEGLIGENT MISREPRESENTATION
(All Defendants)

179.    Plaintiffs reallege and incorporate paragraphs 1 through 178 above.

180.    Plaintiffs allege that the acts, omissions, and misrepresentations by Defendants

constitute negligent misrepresentation. The Fifth Third Defendants, by their own actions

and/or the actions of their agents and employees, including but not limited to Reid,

Kristenak and Employee #957851, orchestrated a scheme by which they falsely

represented that Fifth Third had engaged in a legitimate business transaction when it opened and maintained an account for CLS Capital Group Inc and or Uballe even though they knew or should have known that CLS Capital Group Inc was non-existent since March 1, 2012 and removed from the SEC registration to prohibit use of the shell corporation for criminal purposes. Plaintiffs further allege that the Fifth Third defendants represented that they would allow Uballe and or CLS Capital Group Inc access to a swift code to enable it to wire money to the bank and an account number to enable Uballe and or CLS Capital Group Inc to appear as if they were entering into legitimate business transaction. Plaintiffs further allege that the Fifth Third defendants made additional material representations as describe above in this Complaint.

181.     Plaintiffs allege that when Fifth Third Defendants made representations that CLS Capital Group Inc was a lender doing business with Fifth Third as a legitimate business and or escrow account customer and the purchase of 10 acres on which to construct luxury homes would bring profits and income to Plaintiffs and that Fifth Third had done business with CLS Capital Group Inc before due to the production of documents prior to the commitment agreement in which Fifth Third Defendants had added CLS Capital Group Inc to the escrow account of the Mockensturm Ltd law firm IOLTA account and that the history of Mockensturm in working with CLS Capital Group Inc was given as proof that Mockensturm had done business with CLS Capital Group Inc in the past and that CLS Capital Group Inc had funds in excess of 10 million dollars from which to lend Plaintiffs 10 million dollars, and that Fifth Third would hold these funds in an escrow account or business checking account so that an accounting could be made of the funds. Plaintiffs further allege that since FDIC is a guarantor of these funds being kept in proper

accounts when escrow is required for real estate purchases and construction, that Defendants made representations that it would perform the safe keeping of the funds and or provide CLS Capital Group Inc and or Uballe with a bank statement showing the use of the funds to activities related to the processing of a loan, when the whole process of pretending to have MFG as its underwriter was fake.

182.    Plaintiffs are informed and believe and based thereon allege that these representations were false when made, and that Defendants made these representations without exercising reasonable care or competence in obtaining or communicating the representations made to Plaintiffs and or in providing a Swift code to CLS Capital Group Inc or an account number to CLS Capital Group Inc out of Fifth Third to be used in fraudulent transactions. Plaintiffs further allege that Defendants were grossly negligent in making these misrepresentations. Plaintiffs further allege that Defendants made these representations in the course of their business for the guidance of others in their business transactions by providing access to a Fifth Third account through which to deposit and move funds. Plaintiffs further allege that Defendants intended that Plaintiffs rely upon these representations. In the alternative, Plaintiffs allege that Defendants could reasonably foresee that Plaintiffs would rely on these representations.

183.    Plaintiffs, at the time these representations were made by Defendants, were ignorant of the falsity of the representations and believed them to be true. In reliance on these representations, Plaintiff proceeded to transact business with CLS Capital Group Inc as if the transactions were legitimate and entered into a commitment agreement and related contracts and transferred funds to Defendants for these transactions in the form of cashiers checks with the account number for CLS Capital Group Inc and the name CLS

Capital Group Inc on the face of the cashiers checks, and took other actions in performance of these transactions including but not limited to the retention of a contract on real estate on which to build the luxury homes and meetings with council members regarding the planned construction.

184.     Had Plaintiffs known the actual facts, they would have acted differently to protect their interests. Had Plaintiffs known the actual facts, they would have never entered into the commitment, or any other arrangements to send funds to CLS Capital Group Inc for deposit into a Fifth Third account, or any other contractual arrangement with Defendants to send cashiers checks with the routing number of Fifth Third on the face of the instrument or the account number of an account of CLS Capital Group Inc at Fifth Third on the face of the instrument.  Plaintiffs' reliance on the representations made by Defendants was justified, and Plaintiff had every reason to rely on the representations made by Defendants.

185.     As a direct and proximate result of the representations made by Defendants, Plaintiffs have suffered loss and damages as described in this Complaint, in an amount to be proven at trial. Plaintiffs further contend that they are entitled to exemplary or punitive damages under Section 2315.21, $45 million in lost proceeds, profits and lost wages, and emotional distress.

### Count XI: BREACH OF CONTRACT
#### (All Defendants)

186.     Plaintiffs reallege and incorporate paragraphs 1 through 185 above.

187.     Plaintiffs plead a claim against Defendants for breach of contract.

188.     At all relevant times, Defendants represented and promised to Plaintiffs, both orally and in writing that there had been legitimate transactions relating to an escrow account that had the name of CLS Capital Group Inc attached to it.

189.     Plaintiffs executed written contracts which involved real estate.

190.     Upon information and belief, other real estate transactions involving CLS Capital Group Inc were placed in escrow at Defendants bank. It was believed that the $75,000 was to be placed in an escrow account at Fifth Third.

191.     Plaintiffs have fully performed their obligations under the contract by, among other acts, mailing two cashiers checks totaling $75,000 as required for deposit into the Fifth Third account and arranging to buy the Texas property on which the homes were to be constructed. In the alternative, all performance was tendered by Plaintiffs or excused by Defendants' breach of the contract of ensuring that the account was legitimately opened in the name of CLS Capital Group Inc. All conditions precedent, if any, were performed by Plaintiffs, but there was no commitment on the part of non-existent CLS Capital Group Inc to perform anything except to take Plaintiffs' monies.

192.     Fifth Third materially breached their part in the commitment agreement by, among other things failing to protect the $75,000 in funds in a properly established escrow account. No legitimate escrow account can be set up when the company has been out of business since 3-1-2012.

193.     Fifth Third materially breached the commitment by, among other acts, failing to set aside $75,000 for the duration of the agreement, allowing Uballe as if he were an agent of CLS Capital Group Inc access to the funds that were to be in the Fifth Third

account and failing to accommodate Pierre by setting aside $75,000 at any time since being asked to do so in August 2021.

194.     Plaintiffs have suffered loss and damages as described in this Complaint, in an amount proven at trial.

### Count XII: Breach of Contract-Third Party Beneficiary
### (All Defendants)

195.      Plaintiffs reallege and incorporate paragraphs 1 through 194 above.

196.     Plaintiffs assert a claim against Defendants for breach of contract as a third party beneficiary. To the extent that it was believed that there was a s legitimate transaction for ten million dollars for the purchase of real estate which would have been developed and that the transaction involved Fifth Third and unknown third parties. As Plaintiffs were to be one of the investors in those transactions, Defendants and unknown third parties intended to secure a benefit for Plaintiffs and directly entered into their contractual relationship with Uballe doing business as if he were a director for CLS Capital Group Inc for Plaintiff as an investor and for the Plaintiffs' benefit, and the Plaintiffs were the primary party in interest. Plaintiffs detrimentally relied on Defendants' written representations that CLS Capital Group Inc was in business and contributed money to effectuate said transaction or loan from CLS Capital Group Inc.

197.     Upon information and belief, Defendant breached any contract between themselves and these unknown third parties who believed that were customers of CLS Capital Group Inc when they were merely being scammed by Uballe.

198.     Upon information and belief, the unknown third parties performed on these contracts, or in the alternative performance was tendered or excused.

199.     Plaintiffs have suffered loss and damages as described in this Complaint, in an amount to be proven at trial.

### Count XIII: Negligence
### (All Defendants)

200.     Plaintiffs reallege and incorporate paragraphs 1 through 199 above.

201.     Plaintiffs plead a cause of action against Defendants for negligence.

202.     Fifth Third owed Plaintiffs a duty to have in place proper anti-money laundering and banking security procedures and to have its employees trained with respect to the same. Fifth Third further owed a duty to Plaintiffs not to affirm transactions as valid without performing adequate investigation of the same, and to investigate suspicious activity or transactions. Fifth Third owes a duty to Plaintiffs not to include a defunct business on an IOLTA account with the credentials of an attorney without first performing its due diligence in investigating that company's background and or that individual's background that claimed to be a director of the defunct company four years after it was placed out of business for failing to pay taxes.

203.     The Fifth Third Defendants owed Plaintiffs a duty not to affirm the transactions as valid without performing an adequate investigation of the same. The Fifth Third Defendants further owe a duty not to affirm the character and credentials of individuals such as Reid and Kristenak without first performing their due diligence in investigating that person's background as having the training, experience and skill in researching whether the blank check company is still in business in the state of Delaware as of the 2016 opening of the bank account and whether or not the company is still in good standing with the Securities and Exchange Commission and whether or not Uballe had any authority vested in him by any vote and whether Helen Odum former secretary of

CLS Capital Group Inc had any knowledge of the corporation having an account at Fifth Third in 2016 to this date.

204.     Defendants inadequately trained their employees to look for suspicious activity, verify the source and legality of funds, and investigate the character and credibility of individuals before giving them access to an account which could be and was used for money laundering.

205.     Fifth Third failed to institute and/or have in place proper and appropriate banking procedures to detect and investigate potentially suspicious activity, persons, and transactions.

206.     Defendants inadequately supervised their employees or agents in allowing them to approve such account openings and transactions and to endorse funds that were deposited into the account as good and from a non-criminal origin or legal source.

207.     In the event Fifth Third is found not to be a guarantor under FDIC or an escrow account, Fifth Third inadequately supervised its employees in allowing them to deposit money into a fake business account.

208.     Defendants did not do their due diligence with respect to the investigation of suspicious activity and persons surrounding the aforementioned transactions. Had Defendants performed the slightest investigation into Uballe's background, they were have discovered that he and CLS Capital Group Inc had been put out of business by the Securities and Exchange commission and required to pay thousands in unpaid taxws. To the contrary, Defendants represented to Plaintiffs through the granting of an escrow account that CLS Capital Group Inc had funds from a non-criminal origin that were from

a legal source." Further, the IOLTA account holder represented to Plaintiffs that CLS Capital Group Inc were of a reputable character and could be trusted.

209.    Defendants' negligence is so egregious as to constitute gross negligence. In the alternative, Defendants acted with malice.

210.    As a direct and proximate result of the negligence of Defendants, Plaintiffs have suffered loss and damages as described in this Complaint, in an amount to be proven at trial. Plaintiffs further contend that they are entitled to exemplary or punitive damages under Section 2315.21, lost wages, and emotional distress.

### Count XIV: RESTITUTION
### (All Defendants)

211.    Plaintiffs reallege and incorporate paragraphs 1 through 210 above.

212.    Plaintiffs plead a cause of action for restitution. Defendants acquired money from Plaintiffs through the aforementioned transactions. Said money was acquired at Plaintiffs' expense. The money, as a matter of equity, justice and law belongs to Plaintiffs.

### DAMAGES AND ATTORNEY FEES

213.    Plaintiffs reallege and incorporate paragraphs 1 through 212 above.

214.    Plaintiffs seek all damages legally available for the aforementioned causes of action in an amount to be determined at trial. These damages include, but are not limited to the following:

215.    Expectation, reliance, and restitution, including but not limited to funds paid into the Fifth Third account;

216.    Lost profits;

217.    Lost business opportunities;

218.    Escrow and other costs associated with the real estate transaction;

219.    Punitive/exemplary damages under common law and the Securities Act.

220.    Three times the actual damages.

221.    Attorney fees and costs under common law and the securities act;

222.    Mental anguish

## **PRAYER**

WHEREFORE, Plaintiffs respectfully pray that upon final hearing of the cause, the Court enter judgment on Plaintiffs' behalf against Defendants for the economic and actual damages requested herein above with pre-judgment and post-judgment interest at the maximum rate allowed by law, attorneys' fees, costs of court, and such other and further relief to which the Plaintiffs may be justly entitled at law or in equity.

A.  On Count 1, against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 and for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

B.  On Count II against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

C.  On Count III against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $75,000 and $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

D.  On Count IV against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

E. On Count V against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

F. On Count VI against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

G. On Count VII against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

H. On Count VIII against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

I. On Count IX against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

J. On Count X against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $45,000,000, with interest continuing to accrue on the unreturned funds from an after November 3, 2018;

K. On Count XI-XIII against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 to be decided at trial;

L. On Count XIV against Defendant Fifth Third and Defendant Reid, Defendant Kristenak and Defendant Employee # 957851 for $75,000 in restitution.

M. Against Defendant Fifth Third for its attorney fees, costs and expenses herein incurred; and

N. For such other and further relief as may be justified and warranted

O. Jury demand endorsed hereon.

LAW OFFICE OF CYNTHIA M. RODGERS, L.L.C

s/Cynthia M. Rodgers

605 Cass St., P.O. Box 1

Dresden, Ohio 43821

(740) 575-6870 Telephone

(740) 754-2484 Facsimile

Email: cynthia@cynthiarodgerslaw.com

Attorney *for Plaintiffs*

**Jury Demand Endorsed hereon**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of March, 2022, the foregoing document was electronically filed with the Clerk of Courts for the U.S.D.C. for the Southern District of Ohio via the Court's CM/ECF system, which system will notify all parties of the filing of same and to unserved Defendants through ordinary US mail. The parties may access this filing through the Court's system.

*/s/ Cynthia M. Rodgers*

Cynthia M. Rodgers (0099896)